IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
December 6, 2023 Session Heard at Martin[1]

## ROBERT L. TRENTHAM v. MID-AMERICA APARTMENTS, LP ET AL.

**Appeal by Permission from the Court of Appeals
Circuit Court for Williamson County
No. 19CV-414        Michael W. Binkley, Judge**

_____

**No. M2021-01511-SC-R11-CV**
_____

This appeal arises from a slip-and-fall incident at an apartment complex in Franklin, Tennessee. On a rainy morning at the Venue at Cool Springs apartment complex, owned and operated by Mid-America Apartments, LP, Robert Trentham slipped and fell on a pedestrian bridge on the way back to his apartment. Mr. Trentham sustained serious injuries and filed a premises-liability lawsuit alleging that MAA had been negligent in maintaining the pedestrian bridge. Mr. Trentham asserted that his slip-and-fall was caused by a microbial growth on the bridge that MAA should have known about and should have addressed. The trial court found in favor of Mr. Trentham, and the Court of Appeals affirmed the decision of the trial court. MAA disputes the holding of the lower courts that it was on constructive notice of a dangerous condition on the pedestrian bridge. We hold that, because the microbial growth on the pedestrian bridge amounts to a "general or continuing condition indicating the dangerous condition's existence," Blair v. W. Town Mall, 130 S.W.3d 761, 762 (Tenn. 2004), MAA was on constructive notice of a dangerous condition on the bridge at the time of Mr. Trentham's fall. Accordingly, we affirm the decision of the Court of Appeals.

### Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals and the Trial Court Affirmed

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which HOLLY KIRBY, C.J., and ROGER A. PAGE, and DWIGHT E. TARWATER, JJ., joined. SARAH K. CAMPBELL, J., filed a dissenting opinion.

---

[1] Oral argument was heard in this case on the campus of the University of Tennessee at Martin as part of the S.C.A.L.E.S (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project. "The Tennessee Supreme Court created [S.C.A.L.E.S] to help students learn about the legal system," providing students with a unique opportunity "to witness oral arguments for actual Supreme Court cases in their communities." See Supreme Court Advancing Legal Education for Students (SCALES), Tennessee Courts, https://www.tncourts.gov/programs/scales-project (last visited December 16, 2024).

Robert F. Parsley, Erin E. Steelman, and Jordan B. Scott, Chattanooga, Tennessee, and Virginia N. Adamson, Karl M. Braun, Rodrequez C. Watson, and Kara G. Bidstrup, Nashville, Tennessee, for the appellants, Mid-America Apartments, LP, and Mid-America Apartments, LP, d/b/a Venue at Cool Springs.

Charles I. Malone and Jason W. Callen, Nashville, Tennessee, and David R. Fine, Harrisburg, Pennsylvania, for the appellee, Robert L. Trentham.

Donald M. Falk, San Francisco, California, and Edward H. Trent, Knoxville, Tennessee, for the Amicus Curiae, Chamber of Commerce of the United States of America.

Wallace W. Dietz and Lora Barkenbus Fox, Nashville, Tennessee, for the Amicus Curiae, Metropolitan Government of Nashville and Davidson County.

Mark T. Freeman and Kristen J. Johnson, Nashville, Tennessee, and Nathan L. Kinard and Peter A. Newman, Chattanooga, Tennessee, for the Amicus Curiae, National Apartment Association.

J. Russell Farrar, Brentwood, Tennessee, for the Amicus Curiae, Public Entity Partners.

Nathan L. Kinard and Peter A. Newman, Chattanooga, Tennessee, for the Amicus Curiae, Tennessee Apartment Association.

Ryan T. Holt and Mark Alexander Carver, Nashville, Tennessee, for the Amicus Curiae, Tennessee Municipal Attorneys Association.

Charles W. Bone and Sara Naylor, Nashville, Tennessee, for the Amicus Curiae, Tennessee Municipal League.

W. Bryan Smith, Memphis, Tennessee, and Brian G. Brooks, Greenbrier, Arkansas, for the Amicus Curiae, Tennessee Trial Lawyers Association.

## OPINION

## I.  FACTUAL AND PROCEDURAL BACKGROUND

On September 24, 2018, Robert Trentham ("Mr. Trentham") fell on a pedestrian bridge at the Venue at Cool Springs, an apartment complex located in Franklin, Tennessee. His fall resulted in serious injuries.  Mr. Trentham ultimately filed this lawsuit against the owner and operator of the apartment complex, Mid-America Apartments, LP[2] ("MAA"), alleging that MAA had not complied with applicable building and housing codes and had negligently failed to maintain the premises in a reasonably safe condition.

Mr. Trentham's family lives in Florida, and he is a legal resident of that state, but he spends significant time working as an attorney in Nashville, Tennessee.  Because of that arrangement, Mr. Trentham leased an apartment at the Venue at Cool Springs beginning in June of 2016.  Before his fall in 2018, Mr. Trentham typically used the fitness center in the apartment complex's clubhouse before work in the morning five to six times per week.

Mr. Trentham recalled that, on the day of the fall, he "worked out for a little over an hour" in the fitness center.  It had rained "fairly significantly" the night before, but the rain had mostly "tapered off" by morning when Mr. Trentham went to work out.  Mr. Trentham's typical route of return to his apartment from the fitness center included a pedestrian bridge.  Unfortunately, at 9:45 a.m. on the date in question, Mr. Trentham fell on the bridge "just before . . . the halfway point."  Mr. Trentham described the fall further:

> [A]ll of a sudden my feet just flew out from under me.  I landed with my right leg straight out in front of me, with my left leg bent back the other way beneath me.  I weigh about 190 pounds.  I landed with all the 190 pounds on that left leg that was bent back under me . . . .

Mr. Trentham added that he was "stunned" and "[in] a lot of pain" after he fell.

Mr. Trentham then tried to push down on the surface with his right foot and tried to pull himself up with his right arm using a rail on the bridge, but he was unable to do so:

> [M]y right foot just kept flying out from under me.  And the surface was so slick with something that couldn't be seen.  It was just like ice.  And I put my hand down, and, you know, I felt, you know, something that was slimy

---

[2] Mid-America Apartments, LP, is a real estate company that "develops, redevelops, and manages apartment communities primarily throughout the Southeast, Southwest, and Mid-Atlantic regions of the United States."  See About MAA, MAA, https://www.maac.com/about-us/ (last visited December 16, 2024).

- 3 -

but clear. I couldn't see what it was, but it was obviously not just water. And when I struggled to get up, it became apparent I would be unable to do that.

After Mr. Trentham's failed attempts to stand up, he noticed a maintenance worker about fifty yards away and called out for help. The maintenance worker tried to help Mr. Trentham stand up but was unsuccessful in doing so. Eventually, Mr. Trentham asked the maintenance worker to call 9-1-1. The maintenance worker obliged. Subsequently, three emergency medical technicians arrived in an ambulance, placed Mr. Trentham on a stretcher, and took Mr. Trentham to Williamson Medical Center for treatment.

In the emergency room at Williamson Medical Center, Mr. Trentham was diagnosed with a ruptured or torn quadriceps tendon. Mr. Trentham's tendon and quadriceps muscle had been completely torn away from his kneecap. At the hospital, Mr. Trentham was provided with an immobilizer extending from his ankle to his hip to ensure that he refrained from bending his leg. When Mr. Trentham was preparing for discharge from the hospital, the emergency room physician informed him that he had sustained a serious injury that would require surgery and instructed Mr. Trentham to follow up with an orthopedic surgeon. Upon his return from the hospital, Mr. Trentham called the apartment office to report his fall, recommending that apartment personnel inspect the bridge.[3]

The next day, Mr. Trentham visited Tennessee Orthopedic Alliance for an appointment with Dr. Christian Anderson ("Dr. Anderson"). Dr. Anderson confirmed Mr. Trentham's diagnosis and recommended surgery. Initially, Dr. Anderson scheduled Mr. Trentham's surgery for October 2, 2018, in Nashville. However, upon further consideration, Mr. Trentham elected to have surgery in Florida instead so that he would be closer to his family while recuperating. Mr. Trentham had surgery on October 5, 2018, and stayed in Florida "a little more than six weeks," before ultimately returning to Nashville to start physical therapy in mid-November.[4]

Mr. Trentham's recovery included frequent physical therapy appointments, at-home exercises, and occasional follow-up visits with Dr. Anderson. Mr. Trentham "thought things were going very well until maybe January or February of 2019 when things started to go south." Around that time, his leg "just started to fail. The leg started to become less stable and got worse." At that point, Mr. Trentham went back to see Dr. Anderson again. Dr. Anderson performed an MRI and observed that Mr. Trentham had re-torn his quadriceps tendon and that the initial surgery had failed. Mr. Trentham was told that he

---

[3] Additionally, four days after the fall, Mr. Trentham sent an email to the apartment complex indicating that he was considering a premises liability claim because of his fall on a "wooden walkway . . . covered with some kind of algae or slime."

[4] Mr. Trentham testified that he was non-weight-bearing on the surgically repaired leg for eight weeks. "I was fitted in a brace, metal brace that was locked at 180 degrees extension so it keeps your leg perfectly straight, and you have to keep that on except for sitting in a shower and a shower chair."

could either try to continue to live with the pain and lack of mobility or opt to get another, more extensive surgery. Mr. Trentham decided to think it over for several months.

Eventually, Mr. Trentham underwent the second surgery, which he was told had about a seventy percent chance of success. That surgery was performed by Dr. Anderson on July 1, 2020, which was followed by an "almost identical [to the first surgery] . . . but . . . more extensive" rehabilitation regimen. Again, Mr. Trentham felt that he was progressing well in the early months after the surgery, but, as with the first surgery, the condition of his leg ultimately started to reverse course. Dr. Anderson conducted another MRI, which indicated that Mr. Trentham had again re-torn the ligament and that the second surgery had failed. Dr. Anderson informed Mr. Trentham that he could opt for a third surgical revision, but that such a procedure had less than a fifty percent chance of success. Again, Mr. Trentham opted to spend time weighing his options, and by the time of trial he had not yet obtained a third procedure.

Mr. Trentham filed a complaint in the circuit court for Williamson County on August 2, 2019. On September 9, 2019, MAA filed an answer to the complaint, asserting several defenses. In April of 2021, MAA filed a motion for summary judgment, which was ultimately denied by the trial judge on June 16, 2021. A two-day bench trial followed later that month.

At trial, Mr. Trentham testified that he could no longer walk up and down steps reciprocally and that he could no longer walk on uneven surfaces. According to Mr. Trentham, he was "still thinking about" undergoing a third surgery but stated that the thought of another surgery was "pretty daunting." Prior to his injury, Mr. Trentham routinely billed a higher number of hours and said that his injury was "the only reason I can think of or know of" that would cause him to bill fewer hours in the following years. In addition, Mr. Trentham's injury drastically limited his ability to enjoy his prior leisure activities.

Dr. James Deatherage ("Dr. Deatherage"), a professional engineer, was called by Mr. Trentham to provide expert testimony regarding the condition of the bridge. Dr. Deatherage testified as follows:

> [The pedestrian bridge] had been poorly maintained, was slick, and it was—that fact that it was poorly maintained and slick was a primary cause of Mr. Trentham's fall.
>
> . . . .
>
> [The pedestrian bridge] was poorly maintained in that—there—the testimony was they're uncertain if it was ever cleaned over the five-year history of the bridge being there. And that's just from—with the type of deck

that that bridge had on it, which was treated lumber, if you don't maintain it, why, you're going to end up with a slick surface.

Dr. Deatherage proceeded to testify that it was his opinion that it was more likely than not that the condition of the bridge caused Mr. Trentham's fall and that, without maintenance, the bridge would have grown fungus and had a slick surface. "If you don't maintain [pressure-treated lumber], it will always become slick," said Dr. Deatherage.

MAA also called an engineer, Richard Rice ("Mr. Rice"), to provide expert testimony at trial and dispute Dr. Deatherage's findings. Mr. Rice disagreed with Dr. Deatherage's opinion that algae and mildew had grown on the surface of the pedestrian bridge, testifying that, "[i]t wasn't like a flat deck that is going to, you know, collect water. This is a slope[d] surface." Mr. Rice stated:

> There was no evidence to show what the coefficient of friction was. Absolutely none. There is no evidence of algae. What the evidence shows is that basically we had a wet bridge that was very wet. There are studies on what the—and [Dr. Deatherage] talks about these studies but [Dr. Deatherage] didn't offer any type of—nothing quantitative to indicate why this would be, you know, a slippery surface, other than it was wet.

Elizabeth Phillips ("Ms. Phillips"), a corporate representative of MAA, testified that she visited the Venue at Cool Springs "monthly" and crossed the pedestrian bridge "at least every other time" she visited the apartment complex. Ms. Phillips testified that no MAA employee had observed any algae or mold accumulation on the pedestrian bridge prior to Mr. Trentham's fall. Likewise, MAA had not received any resident complaints regarding algae, mold, or other slippery substances prior to Mr. Trentham's fall. MAA had a policy of pressure-washing communal areas once a year and would pressure-wash more frequently "as needed." In Ms. Phillips' deposition, she identified pressure washing at least once per year as the applicable standard of care. MAA did not provide evidence that the bridge had been pressure washed during the year in which the accident occurred.

MAA regional service director Billy England ("Mr. England") also testified at trial. He described the pedestrian bridge as "solid, sturdy, well[-]built, a reputable contractor-built bridge." Mr. England said that he did not find any issues with the bridge during a June 15, 2018 inspection, and stated that he would have taken pictures and logged such an issue if he had identified a foreign substance at that time. Mr. England did not notice any algae, mold, or other type of slippery growth on the bridge prior to the date of Mr. Trentham's fall. Additionally, like Ms. Phillips, Mr. England was not aware of any resident complaints regarding the bridge.

The trial court issued a Memorandum and Order that was filed on November 28, 2021. In the Memorandum and Order, the court wrote that Mr. Trentham had proven by a

preponderance of the evidence that MAA "owed [him] a duty to act reasonably to remove, repair, or warn against the slimy substance," that MAA had breached the standard of care, and that Mr. Trentham had suffered both economic and non-economic damages as a result of the fall. The court concluded that MAA was eighty-five percent at fault for Mr. Trentham's fall and injuries, whereas "Mr. Trentham's failure to exercise ordinary care for his own safety was a fifteen percent (15%) factual and legal cause." The court ultimately ordered MAA to pay Mr. Trentham $2,086,842.39, a figure which represents eighty-five percent of his overall economic and non-economic damages.

MAA subsequently filed a Notice of Appeal on December 30, 2021. The Court of Appeals declined to overturn the trial court's findings of fact regarding MAA's duty to Mr. Trentham, concluding that "[t]he trial court's finding that there was a microbial growth on the bridge creating an unsafe condition and its determination that MAA was on constructive notice of this dangerous condition is supported by a preponderance of the evidence." Trentham v. Mid-America Apartments, LP, No. M2021-01511-COA-R3-CV, 2023 WL 163547, at *8 (Tenn. Ct. App. Jan. 12, 2023), perm. app. granted, (Tenn. July 13, 2023). The intermediate appellate court also declined to overturn the trial court's holding that Mr. Trentham's injury had been caused by MAA's conduct and concluded that the trial court did not err with regard to its comparative fault findings and its assessment of damages. Id. at *9–12. Accordingly, the Court of Appeals affirmed the judgment of the trial court in its decision dated January 12, 2023.[5] Id. at *12.

On March 13, 2023, MAA appealed the decision in accordance with Rule 11 of the Tennessee Rules of Appellate Procedure. Our Court granted MAA's application for permission to appeal on July 13, 2023, and heard oral arguments on December 6, 2023, in Martin, Tennessee.

## II. ANALYSIS

In its application for permission to appeal, MAA posed a single question to our Court, asking whether:

> In Tennessee premises-liability law, is the foreseeability of a hazardous condition developing legally sufficient to impute constructive knowledge[6] of the condition's actual existence to the property owner?

---

[5] Mr. Trentham raised an additional issue, arguing that the trial court erred by holding that, as a matter of law, "MAA could not be found negligent *per se* for any violation of the building codes on the basis that 'the Court [was] unable to determine whether compliance [with such codes] was mandatory[.]" Trentham, 2023 WL 163547, at *5 (first two alterations in original). Because the Court of Appeals affirmed the decision on other grounds, it did not address the negligence *per se* issue. Id. at *12.

[6] "Constructive knowledge" and "constructive notice" are similar phrases that are often used interchangeably in cases discussing our state's premises-liability jurisprudence. For purposes of

However, both in its brief and at oral argument, MAA devoted a substantial amount of time arguing that <u>Blair v. West Town Mall</u>, 130 S.W.3d 761 (Tenn. 2004), a landmark premises-liability case in Tennessee, is "unworkable" and needed to be "clarif[ied]" and/or partially overruled.[7] Indeed, we first will review <u>Blair</u> and evaluate its current standing. After that, we will address whether MAA owed a duty of care to Mr. Trentham on the basis that it was on constructive notice of a hazardous condition.

### A.      <u>Blair v. West Town Mall</u> and the Common-Occurrence Standard

In <u>Blair</u>, the plaintiff sued a shopping mall after she slipped and fell on slick oil spots as she exited the mall, arguing that the owner of the premises did not exercise ordinary care and failed to keep its premises in a condition safe for patrons. 130 S.W.3d at 762. Our Court began its analysis "by clarifying the general application of the method of operation theory in premises liability cases in Tennessee and the application of that theory to [<u>Blair</u>]."[8] <u>Id.</u> at 764. We noted in <u>Blair</u> that "[w]e have previously held that constructive notice can be established by proof that [a] dangerous or defective condition existed for such a length of time that the defendant, in the exercise of reasonable care, should have become aware of the condition." <u>Id.</u> (citing <u>Simmons v. Sears, Roebuck & Co.</u>, 713 S.W.2d 640, 641 (Tenn. 1986)). At the time, our Court had not yet considered whether the so-called "method of operation theory" could be relied upon in determining constructive notice. <u>Id.</u> After weighing different approaches utilized by the Courts of Appeals, our Court concluded that, "in Tennessee, plaintiffs may prove that a premises owner had constructive notice of the presence of a dangerous condition by showing a pattern of conduct, a recurring incident, or a general or continuing condition indicating the dangerous condition's existence." <u>Id.</u> at 764–66. Such an approach, said the Court,

---

consistency, we will primarily use the term "constructive notice" in this opinion, as our Court did in <u>Blair v. West Town Mall</u>, 130 S.W.3d 761, 769 (Tenn. 2004).

[7] Similar arguments are presented in the amici curiae briefs filed in support of MAA.

[8] It should be noted that our Court explicitly disapproved the "method of operation" title in <u>Blair</u>:

> Method of operation is not a useful title for this theory. The term method of operation suggests that the owner's method of operation, or way of doing business, is part of the inquiry. But under the theory we now adopt, the owner's way of doing business is not determinative. The question is whether the condition occurs so often that the premises owner is put on constructive notice of its existence. The condition could be caused by the owner's method of operation, by a third party, or by natural forces. A premises owner is put on constructive notice of a dangerous condition that is "a recurring incident, or a general or continuing condition" regardless of what caused the condition, and regardless of whatever method of operation the owner employs.

<u>Blair</u>, 130 S.W.3d at 766.

"simply recognizes the logical conclusion that, when a dangerous condition occurs regularly, the premises owner is on constructive notice of the condition's existence. This places a duty on that owner to take reasonable steps to remedy this commonly occurring dangerous condition." Id. at 766. We added that, "[a]llowing plaintiffs to prove constructive notice [by showing a pattern of conduct, a recurring incident, or a general or recurring condition] relieves plaintiffs of the difficult burden of showing the duration of a particular occurrence . . ." Id.

MAA advocates for a partial overruling of Blair, arguing that we "[f]irst, . . . should reject Blair's suggestion that a 'pattern of conduct,' such as [an] owner's mode of operating, can establish constructive knowledge in the absence of evidence of past accidents and dangerous conditions [and, s]econd, the Court should strike Blair's cryptic phrase 'general condition,' which is misleadingly vague and unhelpful." Further, MAA requests that our Court "clarify" the common-occurrence standard:

> (1) by requiring present and past injury-causing accidents to be substantially similar in all material respects (character, source, location, and other relevant circumstances); (2) by limiting relevance to prior *accidents*, as John Gerber[ Co. v. Smith, 263 S.W. 974 (Tenn. 1924)] and progeny does, or alternatively by requiring prior conditions to meet all the same substantial-similarity requirements that prior accidents must meet; and (3) by requiring prior accidents to be proved by a preponderance of the evidence.

Mr. Trentham counters that "MAA and its *amici* misread Blair and ask the Court to adopt a rigid test that ignores reality." "Simplicity of application is a virtue for a legal test," argues Mr. Trentham, "but that virtue can easily be outweighed if the result is illogical and unfair."

Our Court rarely exercises its power to overrule prior decisions, only doing so when there are compelling reasons that require the use of such power. Cooper v. Logistics Insight Corp., 395 S.W.3d 632, 650–51 (Tenn. 2013) (Koch, J., dissenting) (citing Edingbourgh v. Sears, Roebuck & Co., 337 S.W.2d 13, 14 (Tenn. 1960)). Still, we do "have a duty to reject principles of law that no longer work." Id. at 651 (citing State v. Kendricks, 891 S.W.2d 597, 603 (Tenn. 1994)). Accordingly, we must "correct plain and palpable errors even though they may have been re-asserted and acquiesced in for a long number of years." Id. (quoting Arnold v. Mayor & Aldermen of Knoxville, 90 S.W. 469, 470 (Tenn. 1905)) (internal quotation marks omitted). With these standards in mind, we will address MAA's arguments in turn.

First, we decline to overrule Blair by omitting "pattern of conduct" and "general condition" as means of proving constructive notice. MAA has provided no support for its assertion that inclusion of these terms for proving constructive notice is incorrect or has proven unworkable, other than its disagreement with the outcome in this case. Instead,

MAA argues that these terms were ill-defined in <u>Blair</u> and thus ought to be discarded altogether. We disagree. Confusion surrounding the definitions of these terms is not an issue that has been made apparent to us by courts in our State. <u>See, e.g.</u>, <u>Katz v. Sports Auth. of Metro. Gov't of Nashville & Davidson Cnty.</u>, No. M2016-01874-COA-R3-CV, 2017 WL 3741346, at *5 (Tenn. Ct. App. Aug. 29, 2017) (deducing from case law that, to qualify as a pattern of conduct or general condition, "more than a random occurrence" is required). Accordingly, we do not find any compelling reason to deem the language of <u>Blair</u> unworkable or in plain error.

We also decline MAA's requests to "clarify" <u>Blair</u> by adopting its proposed "substantially similar" standard. MAA's proposed revisions to <u>Blair</u> are inconsistent with the facts of this case. All of MAA's requested revisions involve changes to the standard used in evaluating "prior accidents." As Mr. Trentham notes in his brief, he has not at any point "suggested that there was a prior accident or otherwise sought to prove constructive notice in that manner." We find no compelling reason to refine <u>Blair</u>.

Therefore, for the reasons stated above, we conclude that <u>Blair</u> remains good law. Accordingly, we will analyze Mr. Trentham's claim under the rubric established in <u>Blair</u>.

### B. Duty of Care and Constructive Notice

Landowners have an obligation to maintain their premises in a safe condition. <u>McCormick v. Waters</u>, 594 S.W.2d 385, 387 (Tenn. 1980); <u>Parker v. Holiday Hosp. Franchising Inc.</u>, 446 S.W.3d 341, 350 (Tenn. 2014). This duty "arises from the position of control" which the landowner possesses, as the landowner is "normally best able to prevent any harm to others." <u>McCormick,</u> 594 S.W.2d at 387. Thus, in premises liability cases, liability "stems from superior knowledge of the condition of the premises." <u>Blair</u>, 130 S.W.3d at 764 (citing <u>McCormick</u>, 594 S.W.2d at 387).

"To establish a prima facie case for premises liability based upon negligence, the plaintiff must prove (1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant that was below the standard of care, amounting to a breach of a duty; (3) an injury or loss; (4) causation in fact; and (5) proximate causation." <u>Williams v. Linkscorp Tenn. Six, L.L.C.</u>, 212 S.W.3d 293, 296 (Tenn. Ct. App. 2006). At issue in this case is the "duty of care" element. For a defendant to owe a "duty of care" to a plaintiff, the plaintiff has the burden to prove that:

> 1) [T]he condition was caused or created by the owner, operator, or his agent, or 2) if the condition was created by someone other than the owner, operator, or his agent, that the owner or operator had actual or constructive notice that the condition existed prior to the accident.

Blair, 130 S.W.3d at 764 (quoting Martin v. Washmaster Auto Ctr., U.S.A., 946 S.W.2d 314, 318 (Tenn. Ct. App. 1996)). Mr. Trentham does not argue that MAA had actual notice of a microbial growth. Instead, he contends that MAA was on constructive notice that the pedestrian bridge would inevitably become dangerous without pressure-washing and other precautionary measures. Therefore, this case turns primarily on the issue of whether MAA owed a duty of care to Mr. Trentham on the basis that MAA was on constructive notice of a dangerous condition on its pedestrian bridge at the time Mr. Trentham fell.[9] See Blair, 130 S.W.3d at 765–66.

Whether a defendant owes a plaintiff a duty of care is a question of law. McClung v. Delta Square Ltd. P'ship, 937 S.W.2d 891, 894 (Tenn. 1996) (citing Pittman v. Upjohn Co., 890 S.W.2d 425, 428 (Tenn. 1994); Bradshaw v. Daniel, 854 S.W.2d 865, 869 (Tenn. 1993)). Questions of law are reviewed purely *de novo* with no presumption of correctness. Colonial Pipeline Co. v. Morgan, 263 S.W.3d 827, 836 (Tenn. 2008) (citing Perrin v. Gaylord Ent. Co., 120 S.W.3d 823, 826 (Tenn. 2003); Ganzevoort v. Russell, 949 S.W.2d 293, 296 (Tenn. 1997)). In accordance with Tennessee Rule of Appellate Procedure 13(d), the "review of findings of fact by the trial court in civil actions shall be de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d); see also Cross v. City of Memphis, 20 S.W.3d 642, 644–45 (Tenn. 2000). Therefore, to the extent that we review the factual findings of the trial court in the course of our analysis, such findings "shall be set aside only if there is no material evidence to support the verdict." Tenn. R. App. P. 13(d).[10]

MAA asks us to find that "the lower courts erred as a matter of law by charging [MAA] with constructive knowledge and thus a duty [of care]." MAA argues in its brief that it cannot be charged with constructive knowledge of the condition that caused Mr. Trentham's injury because (1) Mr. Trentham did not identify the injury-causing condition with adequate specificity and (2) Mr. Trentham did not establish a duty under its proposed substantial-similarity standard or any other standard for proving constructive knowledge. Mr. Trentham's brief counters that "MAA knew that it was required to pressure wash the wooden bridge to keep it safe . . . [and] knew that, in the absence of pressure washing, a dangerous condition would occur." We will address MAA's two arguments in turn.

---

[9] We observe that this Court at times has referred to constructive notice as an element that must be established in addition to the elements of a negligence claim. See Parker, 446 S.W.3d at 350 ("[P]ersons seeking to prevail against a property owner on a premises liability claim must prove the elements of a negligence claim, *and in addition,* must prove either that the condition was caused or created by the owner, operator, or his agent, or if the condition was created by someone other than the owner, operator, or his agent, that the owner or operator had actual or constructive notice that the condition existed prior to the accident." (emphasis in the original) (internal quotation marks omitted)). We clarify today that constructive notice is most appropriately analyzed as part of the duty element of negligence.

[10] This case was heard by the trial court without a jury. The same standard applies when the trial court acts as the finder of fact.

- 11 -

We first disagree with MAA that Mr. Trentham did not identify the injury-causing condition with adequate specificity and with MAA's contention that "[a]t best, [Mr. Trentham] proved the mere *possibility* of algae or fungus, not its probability."[11]  In this case, the trial court based its conclusions regarding the presence of algae or fungus largely on witness testimony.  "Because the trial court is able to observe witnesses as they testify, appellate courts afford deference to the trial court's credibility assessments of live, in-court testimony."[12]  Phillips v. Hatfield, 624 S.W.3d 464, 474 (Tenn. 2021) (citing Kelly v. Kelly, 445 S.W.3d 685, 692 (Tenn. 2014); Wells v. Tenn. Bd. of Regents, 9 S.W.3d 779, 783–84 (Tenn. 1999)).

The trial court found that Mr. Trentham was "properly able to make [the] distinction [between a slick or slimy growth from water alone] on the basis of normal life experiences" and that Mr. Trentham's testimony "was sincere, honest, and worthy of belief in all respects."  MAA asserts that "[Mr.] Trentham could not identify the nature or source of the substance that he says caused the fall."  Yet, Mr. Trentham consistently testified, and the trial court found credible, that he slipped on "a slimy, natural growth on the pedestrian bridge."  Further, the trial court cited Dr. Deatherage's testimony in its order, noting that "Dr. Deatherage stated his opinion to a reasonable degree of engineering certainty, based on his education, training, experience, and research."  In the trial court's view, MAA did not present any direct evidence that contradicted Mr. Trentham or Dr. Deatherage's testimony.  Accordingly, we conclude that the trial court was within its discretion to find by a preponderance of the evidence that "a slimy, natural growth" was present on the bridge at the time of Mr. Trentham's fall.

We also disagree with MAA's argument that Mr. Trentham failed to establish a duty under established constructive notice standards.  "Constructive notice is defined as information or knowledge of a fact imputed by law to a person (although he may not actually have it) because he could have discovered the fact by proper diligence, and his situation was such as to cast upon him the duty of inquiring into it."  Parker, 446 S.W.3d at 351 (internal quotation marks omitted) (quoting Hawks v. City of Westmoreland, 960 S.W.2d 10, 15 (Tenn. 1997)).  As we have explained, constructive notice may be established by a showing that a "dangerous condition resulted from a pattern of conduct, a recurring incident, or a general or continuing condition," such that "its presence was

---

[11] It should be noted that whether a microbial growth existed on the bridge at the time of Mr. Trentham's fall is a question of fact which "shall be set aside only if there is no material evidence to support the verdict." Tenn. R. App. P. 13(d).  We do not substitute our judgment for that of the trier of fact.

[12] By contrast, "when evaluating documentary proof, the ability of an appellate court to assess the evidence is the same as that of the trial court, and thus there need be no deference afforded to the trial court's assessment." Phillips v. Hatfield, 624 S.W.3d 464, 474 (Tenn. 2021) (citing Kelly v. Kelly, 445 S.W.3d 685, 693 (Tenn. 2014); Wells v. Tenn. Bd. of Regents, 9 S.W.3d 779, 783–84 (Tenn. 1999)).  We specifically note that Dr. Deatherage testified in person at trial.

reasonably foreseeable to the premises owner." <u>Id.</u> at 352 (citing <u>Blair</u>, 130 S.W.3d at 766) (internal quotation marks omitted).

In MAA's application for permission to appeal, its primary assertion was that <u>Blair</u> "rejected" a "method-of-operation foreseeability standard," and that the Court of Appeals' decision in this case is contrary to that rejection. We disagree. This Court made clear in <u>Blair</u> that its holding was not novel, and we specifically stated that the presence of a dangerous condition should be "reasonably foreseeable to the premises owner" in order to establish constructive notice. <u>Blair</u>, 130 S.W.3d at 766. <u>Blair</u> contemplated that a dangerous condition "could be caused by the owner's method of operation, by a third party, or by natural forces," and that a premises owner could be put on constructive notice "regardless of what caused the condition, and regardless of whatever method of operation the owner employs." <u>Id.</u> We stated that "[c]ertainly there will be cases where the method of operation chosen by the owner creates a dangerous recurring condition," but that "there is no logical reason to impute constructive notice *only* in those cases." <u>Id.</u> (emphasis added). Rather than rejecting a foreseeability approach to constructive notice, <u>Blair</u> stated that constructive notice may be established by a "show[ing] that the dangerous condition was part of 'a pattern of conduct, a recurring incident, or a general or continuing condition' such that its presence was reasonably foreseeable to the premises owner." <u>Id.</u> We see no reason to deviate from our longstanding precedent in this case.

The dissent critiques our analysis of <u>Blair</u> on several fronts. For instance, the dissent claims that "<u>Blair</u> never hinted that reasonable foreseeability of unsafe conditions generally is enough to establish constructive notice." Yet, <u>Blair</u> favorably cites <u>McClung</u>, emphasizing <u>McClung</u>'s conclusion that:

> [A] duty to take reasonable steps to protect customers arises if the business knows, or has reason to know, either from what has been or should have been observed or from past experience, that criminal acts against its customers on its premises are reasonably foreseeable, either generally or at some particular time.

<u>Blair</u>, 130 S.W.3d at 766 (quoting <u>McClung</u>, 937 S.W.2d at 902) (emphasis removed). While this case involves a microbial growth instead of a criminal act, the logic of <u>McClung</u> still applies.

Additionally, contrary to our holding in <u>Blair</u>, the dissent claims that knowledge of an unsafe condition can only be imputed "to a premises owner when the same or a similar unsafe condition has occurred previously." However, <u>Blair</u> creates separate categories for "recurring incident[s]" and "general or continuing condition[s]," eliminating the possibility that a previous incident is required within the "general or continuing condition" category. <u>See Blair</u>, 130 S.W.3d at 762. The dissent claims that <u>Blair</u>'s "reference to a 'general or continuing condition' is best understood to mean a dangerous condition that has actually

- 13 -

occurred previously in a general or continuing manner." (emphasis removed). But under the dissent's logic, even though MAA knew that not regularly pressure washing common areas would inevitably create danger for residents, MAA was free to abstain from pressure washing until the first time it actually saw an unsafe condition occur on its own premises. This is the exact type of willful ignorance constructive notice is designed to prevent, and we reject this overly restrictive reading of Blair that would provide premises owners a one-time "get out of jail free" card. The position of the dissent that our holding is "impossible to reconcile with Blair" is patently incorrect.[13]

The dissent seeks to present McClung, 937 S.W.2d 891, and Parker, 446 S.W.3d 341, as examples of other cases that our holding contradicts. We disagree with that assessment. In our view, the McClung holding aligns with our analysis and the facts of Parker are distinguishable from those of the present case. McClung states that, with respect to the duty of premises owners to protect against the criminal acts of third parties, the requisite degree of foreseeability "will *almost always* require that prior instances of crime have occurred." McClung, 937 S.W.2d at 902 (emphasis added). Put simply, McClung does not require that there be a prior incident on the property in every case.[14]

As for Parker, while it does maintain some factual similarities to this case, it is distinguishable. In Parker, the plaintiff used a shower bench in his hotel room that ultimately collapsed, resulting in an injury. 446 S.W.3d at 344. Like the lack of prior complaints and injuries in this case, the owner of the hotel had not received any prior complaints regarding shower benches in the hotel and none of the other shower benches had previously collapsed. Id. at 352. The key distinction between the present case and Parker, however, is that MAA knew it needed to regularly pressure wash the pedestrian bridge to keep it safe and Ms. Phillips acknowledged such in her testimony. Additionally, this Court in Parker determined that the "measures that would have been required to discover the defect, such as dismantling the entire sheetrock wall, are far beyond the parameters of what the duty of reasonable care requires of property owners." Id. We believe that the contrast between the task of dismantling sheetrock and pressure washing on a yearly basis speaks for itself.[15]

---

[13] We also note that the dissent begins by quoting the language from Blair that premises owners "are not insurers of their patrons' safety." Importantly, but not included by the dissent, the very next sentence in Blair reads "However, they are required to use due care under all the circumstances." Blair, 130 S.W.3d at 764.

[14] We note that McClung is also distinguishable because criminal acts of third parties are a type of dangerous condition over which a premises owner has much less control.

[15] Additionally, we note that we are puzzled by the dissent's conclusion that MAA "likely could not have discovered the [microbial growth] given that it would be difficult for a layman to detect." Liability in premises liability cases stems from superior knowledge of the condition of the premises." Blair, 130 S.W.3d 761 (citing McCormick, 594 S.W.2d at 387). We would not characterize MAA as a "layman" in this case.

With regard to whether MAA had constructive notice of the dangerous condition on the bridge, the trial court relied primarily upon guidance set forth in Williams v. Linkscorp Tennessee Six, L.L.C., 212 S.W.3d 293 (Tenn. Ct. App. 2006). In that case, the plaintiff suffered serious injuries after he slipped and fell at a golf course on wet stairs that were made up of railroad cross ties. Id. at 294. According to the court in Williams:

> Given the slippery nature of . . . moss and the time required for it to grow, th[e] evidence tends to show that the moss on the steps constituted a dangerous condition, and that the conditions of the stairs was a general or continuing condition.
>
> . . .Viewing the evidence in its totality and in a light most favorable to [the plaintiff], we believe that a trier of fact could reasonably conclude that [the golf course] should have known about the moss on the steps and the hazard created by such a condition, particularly when wet.

Id. at 296 (internal quotation marks and citation omitted). Despite noting two significant factual distinctions between Williams and Mr. Trentham's case, the trial court concluded that such distinctions were not "outcome-determinative." The trial court found that, in part because the Williams court based its decision upon a "general or continuing condition," Williams was similar enough to the current case to warrant a similar outcome. While we may differ with some of the language utilized in its analysis on this issue, we do not disagree with the trial court's conclusion.

The dissenting opinion calls the distinctions between Williams and the present case "highly material" and argues that, as a result, "Williams does not support" our conclusion. We disagree. First, the dissent claims that a prior fall on similarly designed stairs at the golf course at issue in Williams, albeit on a different hole, is "significant—if not dispositive—under the Blair framework." Yet, the court in Williams included the reference to that incident amongst other reasons for finding that "a general or continuing condition" existed. Williams, 212 S.W.3d at 296 (citing Blair, 130 S.W.3d at 765–66). Put simply, the Williams court did not solely base its conclusion on the prior occurrence. And as the trial court correctly observed, if it had, it presumably would have based its decision on the "recurring condition" component of Blair. Second, the dissent claims that "there is no evidence that the slippery substance had been there for any significant amount of time." Yet, this point is irrelevant. Blair itself sought to "[a]llow plaintiffs to prove constructive notice in [a way that] relieves plaintiffs of the difficult burden of showing *the duration of a particular occurrence*." 130 S.W.3d at 766 (emphasis added). By showing the existence of a "general or continuing condition," Mr. Trentham need not prove the duration of the microbial growth's presence. While the dissent correctly notes that Williams is an intermediate appellate court opinion that does not bind our Court, we regularly utilize lower court decisions as persuasive authority and see no reason to depart from that practice here.

- 15 -

Here, the trial court found that MAA should have known that a microbial growth would arise on the bridge if the bridge was not pressure washed consistently. Dr. Deatherage's testimony indicated that failure to clean a bridge like the one in this case would likely lead to a growth of fungus, causing the surface to become slick. Ms. Phillips and Mr. England's testimonies indicate that MAA was aware that routine maintenance of bridges like the one that was involved in Mr. Trentham's fall is required to prevent unsafe conditions. Despite the fact that MAA did not have actual notice of a microbial growth on the bridge, the trial court found that MAA should have known that failure to pressure wash for over a year would likely lead to the occurrence of a general unsafe condition. We conclude that the "general or continuing condition" provision set forth in Blair is designed to apply to situations like this one, in which it is reasonably foreseeable that an unsafe condition would arise without proper maintenance. Therefore, the dangerous condition on the pedestrian bridge was not unexpected or random.

Additionally, much is made of what, for example, Amici Curiae National Apartment Association and Tennessee Apartment Association label a "perverse incentive" for "owners to abandon maintenance procedures, even of the most general sort" on the basis that the lower court heavily relied upon MAA's policy that required pressure washing of the bridge and other common areas once per year in its finding of duty. The local government amici raise a similar argument in their brief. The dissent allows itself to be caught up in this hyperbolic argument, claiming that "the majority opinion undoubtedly exposes property owners to new liability." Yet, Blair was decided twenty years ago. This case is a straightforward application of Blair. The sky has not fallen over the past twenty years and will not fall as a result of today's decision.

Consider the following example. A Tennessee grocery store owner is aware that, at grocery stores across Tennessee, customers regularly spill cans of soda in the beverage aisle, creating slippery and unsafe conditions. Given that some types of soda lack coloration, not all spills are easily visible. As a result, the grocery store owner implements a policy requiring her employees to clean the floor in the beverage aisle at least once per hour. It would be illogical to suggest that, because of our holding in this case, the grocery store owner would be better served by removing that policy altogether and telling her employees to look the other way. Instead, the rational understanding of our holding is that the grocery store must maintain a policy that keeps the premises safe *and* must also abide by said policy. If a premises owner chooses to bypass maintenance altogether because of our holding in this case, the consequences are all but certain to be unwelcome ones for that owner. Constructive notice is designed to prevent premises owners from feigning ignorance of potentially dangerous conditions, and it will continue to do so.

We conclude that the evidence establishes that the dangerous condition of the bridge at the time of Mr. Trentham's fall was a "general or continuing condition" that was reasonably foreseeable to the premises owner. Notably, this Court also has held that

"foreseeability alone does not establish the existence of a duty," and that "the magnitude of potential harm and the burden imposed upon [the] defendant[] must also be weighed to determine the existence of duty." McClung, 937 S.W.2d at 904. Given that the "potential harm" of an untreated pedestrian bridge in this case was a life-altering injury, and that the burden upon the defendant would only entail abiding by company policy and the company-articulated standard of care of frequent pressure washing, we conclude that MAA owed Mr. Trentham a duty of care in this case. That duty of care was breached under the facts established at trial. Therefore, we affirm the Court of Appeals decision and the trial court's findings that MAA owed a duty to Mr. Trentham and its other residents.[16]

### III.    CONCLUSION

Tennessee law provides that a plaintiff may prove a premises owner had constructive notice of a dangerous condition by showing "that the dangerous condition was part of 'a pattern of conduct, a recurring incident, or a general or continuing condition' such that its presence was reasonably foreseeable to the premises owner." Blair, 130 S.W.3d at 766. For the foregoing reasons, we hold that Mr. Trentham established by a preponderance of the evidence that MAA was on constructive notice that a dangerous, microbial growth would develop on the pedestrian bridge, and that MAA breached its duty of care by failing to pressure wash or otherwise treat the bridge, leading to Mr. Trentham's fall and subsequent injuries. Therefore, we affirm the judgment of the Court of Appeals. The costs of this appeal are taxed to the appellant, Mid-America Apartments, LP, for which execution may issue if necessary.

_____
JEFFREY S. BIVINS, JUSTICE

---

[16] As he did in the Court of Appeals, Mr. Trentham offers the alternative argument that MAA was negligent *per se*. Because we affirm on other grounds, we need not reach that argument.

- 17 -